UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BRIGHTPOINT DISTRIBUTION, LLC, an Indiana Limited Liability Company, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:16-cv-01202-TWP-DLP ) |
| DIGITAL DATA DEVICES, INC., a New Jersey corporation, | ) ) ) ) |
| Defendant. | ) |

## ENTRY ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Plaintiff Brightpoint Distribution LLC's ("Brightpoint") Motion for Summary Judgment. (Filing No. 75.) Brightpoint filed this action alleging breach of contract based on Defendant Digital Data Devices, Inc.'s ("Digital Data") failure to purchase Brightpoint's inventory of Jawbone UP product line, (the "UP Product") pursuant to an agreement between the parties. For reasons explained below, the Court **grants in part and denies in part**, Brightpoint's Motion for Summary Judgment. (Filing No. 75.)

### I.   BACKGROUND

The following material facts are not in dispute and are viewed in a light most favorable to Digital Data, the non-moving party. *See Luster v. Ill. Dep't of Corrs.,* 652 F.3d 726, 728 (7th Cir. 2011). The key players involved in the claims and defenses are as follows: Brightpoint is a consumer electronics distribution corporation that provides services and distributes products to telecommunications and high tech industries. (Filing No. 76 at 3.) Jawbone is a creator of consumer technology and wearable devices, and Jawbone's UP line of products give consumers insight into how they sleep, move, and eat. (Filing No. 1 at 2.) Best Buy is a national consumer electronics

retailer. Brightpoint began selling Jawbone products to Best Buy in 2014. *Id.* at 5. Digital Data is a New Jersey electronics distribution corporation. ([Filing No. 83 at 9](#).) Ely Eddi ("Eddi") is the principal and sole shareholder of Digital Data. *Id.* at 7.

By contractual agreement, Brightpoint began acting as an authorized distributor for Jawbone UP products wearable fitness trackers (the "Jawbone Inventory"), in 2012 and continued to do so at the time of the events giving rise to this lawsuit. ([Filing No. 76 at 4-5](#).) The contract regulated the profit margin that Brightpoint could realize from the sale of Jawbone products to retail customers. Jawbone's representatives were the primary point of contact for sales to Best Buy, and Brightpoint fulfilled those orders. *Id.*

In January 2016, Best Buy wanted to significantly reduce the price of UP Products to move its inventory due to poor retail sales. ([Filing No. 83-7 at 3](#).) Best Buy requested that both Jawbone and Brightpoint authorize rebates or "price protection" approval to offset the losses. *Id.* Brightpoint's contracts with Best Buy allowed Best Buy to return products under certain circumstances. (Filing No. 84-15.) Based on this contract provision, Best Buy requested that Brightpoint take back its entire Jawbone UP inventory. *Id.* at 16. In the event of a return of this nature, Jawbone was contractually required to reimburse Brightpoint for Best Buy's returns of Jawbone product. *Id.* In addition to the UP Product that Best Buy sought to return, both Brightpoint and Jawbone sat on millions of dollars of Jawbone Inventory and Jawbone was indebted to Brightpoint for significant credits and reimbursements that Brightpoint had returned to Jawbone. ([Filing No. 84 at 16](#); [Filing No. 83 at 10](#).) Thus, Brightpoint refused to permit Best Buy to return its Jawbone UP inventory to Brightpoint unless Jawbone agreed to pre-pay for the cost of the return. While Jawbone and Best Buy attempted to work towards a solution, Brightpoint stopped participating in discussions altogether. ([Filing No. 83-3 at 2-3](#).)

On February 9, 2016, Jawbone representative, Jake Langer ("Langer"), informed Brightpoint's representative, Alex Paskoff ("Paskoff") that Jawbone was considering a proposal that would condition the price protection offered to Best Buy on Best Buy buying Brightpoint's remaining inventory. ([Filing No. 83-2 at 2](#).) ("It appears we are headed towards price protection-lowering prices to a level that allows BBY to adjust retail to at least $149 (if not $129) and ask (require) them to pull in the remaining IMM inventory.")[1] The next day, Jawbone presented another option to Brightpoint. Jawbone proposed: "If we were to convince BBY (Best Buy) to simply implement TPC/promotional activity (via sell-through credits) what would need to happen in order for you to implement this?" ([Filing No. 83-2 at 2](#).) Brightpoint forwarded these responses to Best Buy Representative Frank Bedo and promised to keep Best Buy updated. *Id.* However, none of these proposals ever came to fruition.

On March 14, 2016, Langer (representing Jawbone) sent an email to Eddi and Paskoff and suggested that Digital Data and Brightpoint might be interested in working with one another. ([Filing No. 78-1 at 138-140](#).) Between March 14 and March 22, 2016, Brightpoint and Digital Data negotiated a potential purchase price for UP Products. *Id.* at 12. On March 22, 2016, Digital Data made a best and final offer of $797,668.00 for 18,117 units of UP Products. Brightpoint rejected that offer as far below what it would be willing to accept. *Id.* (*See* [Filing No. 78-1 at 150-51](#)).

By March 2016, Amazon's price point for the UP Product became problematic. Langer requested that Best Buy move its online pricing for the UP Product back to $99.00. ([Filing No. 83-3 at 3](#).) Best Buy representative Whitney Hill ("Hill") responded that it was price matching, but could bring the price up to regular retail for twenty-four hours only and "go from there". *Id.*

---

[1] Brightpoint is a wholly owned subsidiary of Ingram Micro Inc. ("IMM").

Langer informed Hill that Jawbone would have Amazon raise its price back up as well.  *Id.*  On March 25, 2016, Langer asked Hill if they could sell all colors of the UP Product at $99.00 or to let Jawbone know if the strategy is to burn through inventory at a really aggressive price point, so that Jawbone could manage expectations with Amazon.  *Id.*  On March 27, 2016, Hill responded that Best Buy's strategy was to burn through what they could, at that point in time, as the UP Product was already showing much slower sales.  *Id.*

On April 5, 2016, two weeks after rejecting Digital Data's best and final offer, Brightpoint suddenly reversed its position and informed Digital Data that it would now accept its March 22, 2016 offer.  ([Filing No. 78-1 at 41](Filing No. 78-1 at 41).)  Because of Brightpoint's abrupt reversal from its prior rejection, Eddi sensed something was amiss and requested a follow-up telephone call with Paskoff to address his concerns.  (*See* [Filing No. 78-1 at 45](Filing No. 78-1 at 45).)  The telephone call occurred late in the afternoon on April 6, 2016.  ([Filing No. 78-1 at 188-89](Filing No. 78-1 at 188-89).)  Eddi asked Paskoff to "tell me the truth.  Why do you want to do the deal now, is there a price move?"  ([Filing No. 78-1 at 41-42](Filing No. 78-1 at 41-42).)  Paskoff responded that there was no price move and that Brightpoint just wanted to move the inventory off their books.  *Id.* at 42.  Eddi asked Paskoff when the next price move would occur.  *Id.*  Paskoff responded not until back-to-school around Labor Day.  Eddi asserts that Paskoff represented the following during the telephone call, in response to his inquiries:

(i)  as the exclusive distributor of Jawbone products to Best Buy and other major retailers, Brightpoint was in a unique position to know, and did in fact know, whether or not any immediate price drops for UP Products were forthcoming;

(ii)  no price drops for UP Products by its retail customers such as Best Buy were on the immediate horizon, and that any such price drops would not be occurring until the "back-to-school" season; and

(iii)  Plaintiff's sole reason for suddenly accepting Digital Data's previously-rejected offer was simply because it wanted to move UP Products off of its books.

4

([Filing No. 83 at 13](Filing No. 83 at 13)). On April 6, 2016, Paskoff emailed Eddi, and copied Steve Krieger to coordinate the wire/inventory transfer details with Eddi for liquidation of the balance of Brightpoint's Jawbone UP inventory to Digital Data for $797,668.00. ([Filing No. 78-1 at 143](Filing No. 78-1 at 143).) Brightpoint sent Digital Data a three-page application in conjunction with the sale, which was completed by Digital Data on April 7, 2016. ([Filing No. 78-1 at 161](Filing No. 78-1 at 161).) The Terms and Conditions of the Sale stated that "[a]ll accepted purchase orders are binding and non-cancellable." *Id.* at 114. The terms also included a clause that "APPLICANT may only return erroneously shipped product that were damaged prior to shipment by BRIGHTPOINT." *Id.* Applicant's requests for credits must adhere to Brightpoint's then-current return processing guidelines, which Brightpoint asserts was five days at the time for any shortages, defects, or non-conforming products. (*See id.*; [Filing No. 76 at 8](Filing No. 76 at 8).) Failure to assert a defect or non-conformance resulted in acceptance of the shipment. ([Filing No. 78-1 at 114](Filing No. 78-1 at 114).)

On April 12, 2016, Digital Data sent a purchase order to Brightpoint for the UP Products. ([Filing No. 78-1 at 116](Filing No. 78-1 at 116).) On April 14, 2016, Brightpoint sent Digital Data two invoices for the Jawbone Inventory. ([Filing No. 78-1 at 119-20](Filing No. 78-1 at 119-20)). The invoice reflected that Brightpoint sold 16,823 pieces of Jawbone Inventory for a purchase price of $740,213.87 to Digital Data. Digital Data began receiving UP Products on April 19, 2016. ([Filing No. 83 at 13](Filing No. 83 at 13).) Three days later (after Digital Data received its shipment), Best Buy drastically dropped the prices on UP Products by approximately 80%. *Id.* As a result of the price drop, UP Product that previously sold for $99.00 were selling for $19.99. *Id.* On April 22, 2016, Eddi contacted Paskoff with concerns regarding the Best Buy price drop; but he did not express any concerns regarding the quantity or quality of UP Product. ([Filing No. 76 at 9-10](Filing No. 76 at 9-10); [Filing No. 78-1 at 187](Filing No. 78-1 at 187).) Between April 22 and April 25, 2016, Eddi, Paskoff, and Langer exchanged emails concerning the Best Buy price reduction and its effect

5

on Digital Data's ability to sell UP Products. (Filing No. 78-1 at 187.)[2] Langer and Eddi discussed a potential deal in which Digital Data would acquire an additional amount of products directly from Jawbone for a reduced price per unit, during an exclusivity period where Digital Data would be sole carrier of Jawbone Product for an asking price of $8,130,000.00 wired to Jawbone by close of business on April 25, 2016. (*See* Filing No. 78-1 at 186.)

On April 25, 2016, Langer contacted Eddi and informed him that there were multiple parties bidding, and some developments had changed bidding for securing exclusive rights on Jawbone products. Langer now requested $13,000,000.00 under the contract. *Id.* at 185. Also, on April 25, 2016, Eddi confronted Paskoff and asked if he knew about Best Buy's impending price drop before selling UP Products to Digital Data. (Filing No. 83 at 14.) Eddi did not ask Langer if he knew about the impending price drop. (Filing No. 78-1 at 159.) On April 26, 2016, Digital Data rejected the UP Products by writing to Paskoff to "let me [Eddi] know how we should proceed with a return . . .". (Filing No. 83 at 14.) Paskoff replied that Brightpoint is unable to issue a price concession or return authorization, and had absolutely no visibility into Jawbone reducing their prices or any retailer reducing their retail price. (Filing No. 76 at 10). Digital Data's customers that had previously committed to purchase UP Products refused to do so after Best Buy's price drop. (Filing No. 83 at 13-14.) To date, Digital Data has not paid Brightpoint the $740,213.87 owed for Jawbone products, and on May 13, 2016, Brightpoint filed the instant action to recover the contract price including interest. (Filing No. 1.) Under the contract, Brightpoint is entitled to attorneys' fees and court costs, incurred in enforcing its contractual rights. (Filing No. 78-1 at 114.)

---

[2] On April 22, 2016, Paskoff forwarded the email from Eddi to Langer at Jawbone. (Filing No. 78-1 at 187.)

6

On July 8, 2016, Digital Data filed its Answer asserting an affirmative defense that Brightpoint fraudulently induced it to agree to the purchase of UP Products in April 2016, and that Brightpoint's fraudulent conduct estops its breach of contract claim. ([Filing No. 8](#).) Additionally, Digital Data asserts that from the time discovery commenced in this action, Brightpoint has sought to hide documents which reveal its prior knowledge of Best Buy's impending price drop on UP Products ([Filing No. 83 at 16](#)). Ultimately, Digital Data discovered documents through Best Buy's production that it alleges undercut Paskoff's testimony that (i) "the last time we had communication with Best Buy regarding Jawbone product would have been December of 2015" and (ii) Plaintiff did not have any unproduced communications with Best Buy." *Id.*

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal

7

quotations omitted). Indeed, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("these are jobs for a factfinder"); *Hemsworth*, 476 F.3d at 490. Instead, when ruling on a summary judgment motion, a court's responsibility is to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Id*. "Since a single valid defense may defeat recovery, [a] claimant's motion for summary judgment must be denied when any defense presents significant fact issues that should be tried." *Walters v. PDI Mgmt. Servs.,* No.1:02-cv-1100-JDT-TAB, 2004 U.S. Dist. LEXIS 13972 at *8 (S.D. Ind. Apr.6, 2004).

## III.  DISCUSSION

Brightpoint contends that Digital Data breached its contract to pay for the Jawbone UP Products. ([Filing No. 76 at 14](#).) Digital Data asserts an affirmative defense that it was fraudulently induced to enter into the agreement. ([Filing No. 83 at 18](#).)

### A.  **Breach of Contract**

"Summary judgment is particularly appropriate in cases involving written contracts." *Moriarty v. Svec,* 164 F.3d 323, 330 (7th Cir. 1998). The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages. *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.,* 953 N.E.2d 1125, 1128–29 (Ind. Ct. App. 2011). Digital Data's one paragraph response to Brightpoint's breach of contract claim raises the issue that the contract required Brightpoint to deliver 18,117 units of UP Products, rather than the 16,823 units that Brightpoint shipped. Thus, Digital Data contends that Brightpoint failed to satisfy a material term of the agreement. This argument is unavailing for two reasons. First, Paskoff's email to Eddi confirming the transaction terms states that Brightpoint would liquidate the balance of its Jawbone UP Products to his firm for $797,668.00 ([Filing No. 78-1 at 150](#)). After the UP Products were

shipped, Brightpoint invoiced Digital Data $740,213.87 for its entire remaining inventory, at the time of the shipment. This sale price reflects that Brightpoint had sold less than 7% of its initially stated inventory prior to shipment. Given that the terms of the contract were for liquidation of the balance of Jawbone UP Products, the fact that Brightpoint actually shipped 16,823 units of UP Products was not an alteration of a material term. Moreover, Digital Data did not object within the specified five-day deadline for any alleged non-conformity of the actual shipment. Instead, Digital Data only raised concerns about the Best Buy price drop. Accordingly, summary judgment is **granted** to Brightpoint on the breach of contract claim.

B. <u>**Fraudulent Inducement**</u>

Digital Data's affirmative defense is that the contract was procured by fraud. ([Filing No. 83 at 18.](#)) Digital Data alleges both actual fraud and constructive fraud. The Court will address each theory in turn.

1. <u>**Actual Fraud**</u>

To succeed on a fraudulent misrepresentation claim, a plaintiff must prove: a "(i) material misrepresentation of past or existing facts by the party to be charged (ii) which was false (iii) which was made with knowledge or reckless ignorance of the falseness (iv) was relied upon by the complaining party and (v) proximately caused the complaining party injury." *Johnson v. Wysocki,* 990 N.E.2d 456, 460–61 (Ind. 2013) (citations omitted). "In Indiana, an action for fraud must relate to a present or pre-existing fact." *Murphy v. Mellon Accountants Prof'l Corp.,* 538 N.E.2d 968, 970 (Ind. Ct. App. 1989). "[T]he general rule in Indiana is that if a statement is 'susceptible of exact knowledge' when made, it is a statement of fact rather than opinion." *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.,* No. 1:08 CV 35, 2009 WL 449173, at *3 (N.D. Ind. Feb. 23, 2009) (citation omitted).

9

Digital Data argues that Paskoff made three misrepresentations on April 6, 2016 that fraudulently induced it to enter into the contract. The misrepresentations include:

> (i) as the exclusive distributor of Jawbone products to BestBuy and other major retailers, Brightpoint was in a unique position to know, and did in fact know, whether or not any immediate price drops for UP Products were forthcoming;
>
> (ii) no price drops for UP Products by its retail customers such as BestBuy were on the immediate horizon, and that any such price drops would not be occurring until the "back-to-school" season; and
>
> (iii) Plaintiff's sole reason for suddenly accepting Digital Data's previously rejected offer was simply because it wanted to move UP Products off of its books.

([Filing No. 83 at 19](#)). For purposes of summary judgment, the issue is whether the representations were actionable statements and whether Digital Data reasonably relied upon those statements. Misrepresentations regarding future conduct cannot support an actual fraud action. *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998). Brightpoint responds that "[e]ven if Digital Data's allegations were true (and they are not), Paskoff's alleged statements are not actionable because: 1) they concern the future intent of a third-parties; and 2) Digital Data has not introduced any evidence demonstrating that those statements were false". ([Filing No. 84 at 3](#).)

Digital Data contends that Paskoff made misrepresentations that he knew to be false or were made with reckless disregard for the truth when he stated that there were no immediate price drops forthcoming. ([Filing No. 83 at 19-20](#).) Specifically, Digital Data points to alleged inconsistent statements that it contends creates factual disputes. To begin, Digital Data contends that Paskoff stated that he was in a unique position to know—as exclusive distributor of Jawbone products to Best Buy—whether or not any immediate price drops for UP Products were forthcoming and that any such price drops would not be occurring until the "back-to-school" season or Labor Day. *Id.* at 19. Furthermore, Digital Data alleges that Paskoff's statement that Brightpoint only wanted to sell UP Products to get them off its books were actionable fraudulent

10

statements given the communications between Jawbone, Brightpoint, and Best Buy. In support, Digital Data cites to discussions and proposals between Jawbone, Brightpoint, and Best Buy to prevent Best Buy from dropping the prices of UP Products and unloading UP Products at a deep discount. *Id.* at 21.

"Actual fraud may not be predicated upon representations of future conduct." *Heyser v. Noble Roman's Inc.,* 933 N.E.2d 16, 19 (Ind. Ct. App. 2010). Here, Brightpoint's representations concerned future conduct in that the price drops that Digital Data inquired into were future price drops. Moreover, Brightpoint's representations concerned future conduct of a third party, Best Buy, which actions it could not guarantee even if Brightpoint had knowledge at some point in time. Viewing the facts in a light favorable to Digital Data, Brightpoint's representations concerned acts of future conduct and are not actionable statements. Accordingly, summary judgment is **granted** on the affirmative defense of actual fraud.

### 2. Constructive Fraud

Digital Data also alleges an affirmative defense of constructive fraud, an equitable estoppel defense. "Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud." *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998). "In constructive fraud, the law infers fraud from the relationship of the parties and the circumstances which surround them. It is not necessary to show that there was actual intent to defraud." *Id.* at 1251. "A representation regarding future conduct can, in some situations, give rise to a constructive fraud." *Id.* at 1250. "The existence of a duty for constructive fraud may arise in one of two ways: by virtue of the existence of a fiduciary relationship, or, in the case where there is a buyer and a seller, where one party may possess knowledge not possessed by the other and may thereby enjoy

11

a position of superiority over the other." *Am. Heritage Banco, Inc. v. Cranston,* 928 N.E.2d 239, 247 (Ind. Ct. App. 2010). "[C]onstructive fraud may arise in a buyer/seller relationship when: (1) a seller makes unqualified statements to induce another to make a purchase; (2) the buyer relies upon the statements; and (3) the seller has professed to the buyer that he has knowledge of the truth of those statements." *Id.* "As a matter of course, every buyer/seller relationship likely involves a party who possesses at least some knowledge not possessed by the other, but that fact alone does not mean that one party enjoys a position of superiority over the other so as to create a special duty and a right of reliance." *Id.*

Brightpoint argues that Digital Data cannot rely on the doctrine of constructive fraud to avoid enforcement of the contractual agreement because Digital Data is a sophisticated buyer who has engaged in the wholesale distribution of electronics and electronics accessories for nearly twenty years. Eddi has negotiated agreements with global manufacturers such as Samsung and LG. ([Filing No. 78-1 at 9.](#)) Eddi has also entered into distributor agreements where he has obtained price protection in the past. *Id.* at 20-21. Eddi's sophisticated experience is proven by the fact that he knew to ask Paskoff if a price move was on the horizon.

Digital Data asserts that there are material questions of fact regarding whether or not Brightpoint had superior knowledge to form an unconscionable advantage over Digital Data in negotiating the contract. The same set of facts that surround Digital Data's affirmative defense of actual fraud make up its affirmative defense for constructive fraud. Digital Data alleges that Brightpoint knew of Best Buy's impending price drop and verbally misrepresented that fact. ([Filing No. 83 at 28.](#)) It is well settled that although an oral promise as to future conduct will not support an ordinary fraud action, such promise may form the basis of a constructive fraud action if it induces one to place himself in a worse position than he would have been in had no promise

been made and if the party making the promise derives a benefit as a result of the promise. *Strong v. Jackson*, 777 N.E.2d 1141, 1149 (Ind. Ct. App. 2002). Digital Data asserts that Brightpoint had superior knowledge that "BestBuy's sales for the Products were far behind expectations and it was sitting on a large inventory of unsold Products and BestBuy had informed Brightpoint of its desire to drop the prices of Jawbone Products." (Filing No. 83 at 28.) In addition, Digital Data alleges that "Brightpoint, Jawbone, and BestBuy explored several proposals to reduce the net cost of the Up Products to BestBuy, to prevent BestBuy from dropping the prices and unloading the Up Products at a deep discount; and Jawbone held those proposals hostage until Jawbone paid to Brightpoint its outstanding balance for returned items." *Id*. Because a material factual dispute exists as to whether Brightpoint had superior knowledge as to an impending price drop and whether or not Brightpoint misrepresented this fact, summary judgment is **denied** as to Digital Data's affirmative defense of constructive fraud.

## IV. CONCLUSION

For the foregoing reasons, Brightpoint's Motion for Summary Judgment (Filing No. 75) is **GRANTED in part** and **DENIED in part**. It is **GRANTED** on Brightpoint's breach of contract claim and Digital Data's affirmative defense of actual intent to defraud. Summary judgment is **DENIED** as to Digital Data's defense of constructive fraud.

**SO ORDERED.**

Date: 5/2/2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Aaron D. Grant
LEWIS WAGNER LLP
agrant@lewiswagner.com

A. Richard Blaiklock, M.
LEWIS WAGNER, LLP
rblaiklock@lewiswagner.com

Adam Katz
OVED & OVED LLP
akatz@ovedlaw.com

Andrew Urgenson
OVED & OVED
andrew@ovedlaw.com

Cynthia A. Bedrick
MCNEELY STEPHENSON THOPY & HARROLD
cabedrick@msth.com

Darren Oved
OVED & OVED LLP
darren@ovedlaw.com

Scott Aaron Milkey
MCNEELY STEPHENSON THOPY & HARROLD
scott.a.milkey@msth.com